UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

JOSHUA ADAM SUTTOON                CIVIL ACTION NO. 6:20-cv-00531

VERSUS                             JUDGE JUNEAU

COMMISSIONER OF THE SOCIAL         MAGISTRATE JUDGE HANNA
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability.

Considering the administrative record, the briefs of the parties, and the applicable

law, it is recommended that the Commissioner's decision should be affirmed.

## Administrative Proceedings

The claimant, Joshua Adam Suttoon, fully exhausted his administrative

remedies before initiating this action. He filed an application for disability insurance

benefits ("DIB"),[1] which was denied.[2] A hearing was held before Administrative

Law Judge Lawrence T. Ragona.[3] The ALJ decided that Mr. Suttoon was not

disabled between the alleged disability onset date and the date of the ruling.[4] Mr.

---

[1]    Rec. Doc. 7-1 at 159.

[2]    Rec. Doc. 7-1 at 75.

[3]    A transcript of the hearing is found in the record at Rec. Doc. 7-1 at 42-73.

[4]    Rec. Doc. 7-1 at 15-23.

Suttoon requested Appeals Council review, but the Appeals Council found no basis for review of the ALJ's decision.[5]  Therefore, the ALJ's ruling became the final decision of the Commissioner for the purpose of judicial review.[6]  Mr. Suttoon then initiated this action, seeking review of the Commissioner's decision.

## Summary of Pertinent Facts

Mr. Suttoon was born on May 13, 1982.[7]  At the time of the ALJ's decision, he was thirty-six years old.  He completed the sixth grade[8] and has relevant work experience as a fitter in shipyards, a deckhand on boats, and as a self-employed truck driver.[9]  He alleged that he has been disabled since February 15, 2017[10] due to severe manic bipolar 1 disorder with psychotic features, paranoid schizophrenia, anxiety, depression, and insomnia.[11]

On February 11, 2017,[12] Mr. Suttoon went to the emergency room at Teche Regional Medical Center in Morgan City, Louisiana, with a laceration of his left ear,

---

[5]      Rec. Doc. 7-1 at 6.

[6]      *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[7]      Rec. Doc. 7-1 at 45, 159.

[8]      Rec. Doc. 7-1 at 46.

[9]      Rec. Doc. 7-1 at 70-71, 179, 204, 236.

[10]     Rec. Doc. 7-1 at 159, 178.

[11]     Rec. Doc. 7-1 at 178.

[12]     Rec. Doc. 7-1 at 274-275, 328-331.

insomnia, and generalized anxiety disorder.  The cut was superficial, clean, and not bleeding.  He denied being in pain.  He was oriented to person, place, and time; his gait was steady; and his speech was normal.  The laceration was cleaned with normal saline, which Mr. Suttoon tolerated well.  However, he was in a hurry to leave, refused medication, refused to have his vital signs assessed, and no physician assisted procedures were completed.  It was noted that he had no functional deficits.

Mr. Suttoon returned to Teche Regional's ER the next day, complaining with anxiety, chest pain, and shortness of breath.  He associated his anxiety with his wife's having recently left him.[13]  He denied being in pain, and he denied suicidal and homicidal ideation.  The diagnosis was panic disorder (episodic paroxysmal anxiety) without agoraphobia.  He was given Ativan (an anti-anxiety medication) in the ER and a prescription for Oleptro (an antidepressant).

Two days later, on February 14, 2017, Mr. Suttoon went to the emergency room at Terrebonne General Hospital in Houma, Louisiana, with his mother and his three children in tow.[14]  He complained that Teche Regional had not been taken him seriously.  He said he felt stressed and weak and had not slept for days.  He requested imaging for head trauma because he believed his wife and her new boyfriend had entered his home while he was sleeping and struck him in the head.  The laceration

---

[13]     Rec. Doc. 7-1 at 286, 334-337.

[14]     Rec. Doc. 7-1 at 296-317.

to his left ear was healing.  He was anxious and unable to keep still on the stretcher. He exhibited chest pain, agitation, confusion, dysphoric mood, sleep disturbance, flight of ideas, and paranoid ideation.  He was nervous, anxious, and hyperactive. He was tachycardic during triage, his speech was pressured, and he was agitated, but his thoughts were cohesive, and he was oriented.  He was somewhat tearful at times. His affect was depressed but he denied homicidal or suicidal ideation.  He asked his son if he had seen deceased family members.  It was noted that he was "not gravely disabled."  A CT scan of his head showed no evidence of bleeding or skull fracture. Upon discharge, Mr. Suttoon attempted to stop the staff from discharging him and threatened to call the police.  Security personnel escorted him to the hospital lobby. The final diagnoses were anxiety disorder, unspecified, and major depressive disorder, single episode, unspecified.

The next day, February 15, 2017, Mr. Suttoon went to the emergency department at Our Lady of Lourdes Regional Medical Center in Lafayette, Louisiana, with psychotic symptoms.[15]  He was exhibiting bizarre behavior, was increasingly paranoid, and talking out of his head.  He claimed he had not slept in several days.  It was noted that his family has a strong history of psychosis.  Mr. Suttoon was alert and oriented to person, place, time, and situation; he was

---

[15]    Rec. Doc. 7-1 at 354-358.

cooperative; his mood was anxious; his thoughts were abnormal, psychotic, delusional, obsessive, and tangential; and he was exhibiting a flight of ideas. The plan was to transfer him to a psychiatric facility.

Pursuant to a physician's emergency certificate and a coroner's emergency certificate, Mr. Suttoon received in-patient psychiatric treatment at Abrom Kaplan Memorial Hospital in Kaplan, Louisiana from February 16 through February 22, 2017.[16] His wife gave a history of mental illness on both sides of Mr. Suttoon's family, including his father and brother both being schizophrenic. Mr. Suttoon's bizarre behavior had begun about a week earlier. He claimed that he had not slept in several days, that he had received no previous psychiatric treatment, and that he was a self-employed trucker, but his truck was broken. His primary symptoms were confusion, disorientation, and concentration difficulties. He was hypertalkative, disorganized, and paranoid as well as very irritable and argumentative. He did not believe he needed to be hospitalized and was incapable of reality-based thinking. Denial and noncompliance were barriers to treatment. He was fidgety, disheveled in dress, uncooperative, and difficult to redirect. His thought processes were tangential and exhibited a flight of ideas. He showed poor judgment and insight.

---

[16]    Rec. Doc. 7-1 at 359-366, 373-570; Rec. Doc. 7-2 at 10-202.

His problem list included paranoid delusions and mood lability. He was admitted for individual and group therapy as well as medication management.

On February 20, 2017, he continued to exhibit bizarre behavior with increased psychosis and paranoia as well as demanding and pressured speech. He stated that he was being held against his will and was going to sue the hospital, doctors, and nurses. He claimed that nothing was wrong with him and that he would not take any medicine or go to any group sessions. The security guard had to stay on his unit due to his behavior. He continued to talk over other people, exhibited pressured speech, and was demanding and grandiose. On February 19, he continued to deny any problems and threatened staff and security personnel. On February 20, he continued to ramble non-stop, had trouble focusing on one topic, and described himself as nervous, anxious, and upset. On February 21, 2021, Mr. Suttoon took his medication after much prompting, went to group sessions but was disruptive, and was still manic and hyperverbal with pressured and grandiose speech. However, he admitted that he felt the medication was helping him. On February 22, he was sleeping all night and eating well. He still had pressured speech and was intrusive and agitating other patients, but his family felt he was doing well and reported that this was his baseline since he was always hyperactive and very talkative. He was taking his medication and agreed to continue doing so after discharge. His mood was anxious and worrisome, his thought process showed loose associations and a flight of ideas, he

had paranoid delusions, his speech was pressured and excessive, his attitude was suspicious, his affect was expansive, his appearance was disheveled, and he was having tremors. His attention, concentration, judgment, and abstract thinking were impaired. At discharge, he was diagnosed with severe manic bipolar I disorder with psychotic features, mood congruent. He was prescribed Benztropine, Divalproex (Depakote), and Quetiapne (Seroquel) and advised to seek out-patient treatment.

Mr. Suttoon treated with Southwest Primary Health Care in Opelousas, Louisiana from June 2017 through February 2019 for medical and mental health problems. On June 26, 2017, he established care with Darin Lastrapes, a family nurse practitioner.[17] He requested medication refills and a referral for mental health care. He explained that he had had a mental breakdown, but denied suicidal ideation, denied homicidal ideation, and denied hearing voices. He reported that he struggled to take medication but was coming to grips with having to do so. He had been prescribed Divalproex, Quetiapine, and Benztropine. He reported vision problems and dizziness. The assessment was bipolar 1 disorder, most recent episode, depressed. He was to continue his medications and return in one month. When Mr. Suttoon returned to see nurse Lastrapes on July 25, 2017,[18] it was noted that his

---

[17]    Rec. Doc. 7-2 at 422-423.

[18]    Rec. Doc. 7-2 at 421-422.

mental health appointment had been cancelled due to staffing issues. He was waiting for another appointment.

On August 15, 2017, Mr. Suttoon was examined by clinical and medication psychologist Amy Cavanaugh, Ph.D., MP, at the request of Disability Determination Services.[19] He was appropriately groomed, his speech was rapid and pressured, and his thought process and content were tangential with flight of ideas. He described his mood as "disgusted, not good. . . I feel awful." He claimed to have attention and short-term memory problems. He was cooperative and intense and demonstrated basic social skills. His judgment and insight were poor.

Mr. Suttoon told Dr. Cavanaugh that his problems were evident when he was very young, but he was able to hide them until recently. He said he was able to bathe, dress, and use the toilet by himself but required assistance with transportation, cooking, cleaning, and managing money, all of which were handled by his wife. He said he had problems remembering to take his medicine and remembering appointments. He reported that he was held back in second grade, failed fourth grade, and failed seventh grade because he could not concentrate or focus. He denied being treated for any medical conditions. He claimed to have severe mania, bipolar I disorder with psychotic features, paranoid schizophrenia, anxiety, depression, and

---

[19]     Rec. Doc. 7-1 at 582-585.

insomnia.  Dr. Cavanaugh noted that it was difficult to obtain information from Mr. Suttoon because his thought process was very disorganized and tangential.  He denied current suicidal thoughts but stated that he had them in the past.  He reported that he had always been a nervous person and did not back down from a fight.  He gave a history of inpatient psychiatric treatment.  He reported that he was taking Divalproex, Benztropine, and Quetiapine.  He gave no information regarding mental health counseling or therapy.  He explained that he had worked at shipyards, on boats, and in his own trucking business but he could not get along with coworkers.

Dr. Cavanaugh found Mr. Suttoon to be alert and aware of his surroundings. He adequately understood instructions, but instructions had to be repeated several times because Mr. Suttoon did not stop talking long enough to listen to them.  He appeared distressed during the interview and anxious during the testing, which suggested to Dr. Cavanaugh that he had difficulty handling work-related stress.  In Dr. Cavanaugh's opinion, he displayed problems with attention and concentration but exhibited fair persistence.  He would attempt tasks then get distracted and start talking about an unrelated subject.  He did not appear to have any memory problems, but he appeared incapable of counting money.

Dr. Cavanaugh concluded that, based on history, observations, and assessment, Mr. Suttoon's mental health was "severe in severity."  Her findings indicated that he had the capacity to understand, retain, and follow instructions but

his ability to sustain concentration to perform complex tasks was impaired; his ability to relate to others, including supervisors and coworkers, was poor; his ability to tolerate the stress and pressure of day-to-day work was below normal limits; and his ability to sustain effort and persist at a normal pace over the course of a forty-hour work week was significantly impaired. Further, he did not appear capable of managing his personal financial affairs. She diagnosed him with Bipolar I Disorder, Manic, Severe with Psychotic Features; Schizophrenia, Paranoid Type; and Anxiety Disorder, NOS. She assigned a GAF score of 35.[20]

On October 20, 2017,[21] Mr. Suttoon saw psychiatric nurse practitioner Valecia Vaughn for an initial psychiatric evaluation and medication management. Mr. Suttoon was appropriately dressed, with good hygiene. He had no unusual body movements and a steady gait. His speech was clear with good articulation at a mildly increased rate and volume, and he was rambling. His affect was pleasant, and he described his mood as "different things make me feel different ways." His thought

---

[20]     The GAF scale is used to rate a person's "overall psychological functioning." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–IV") 32 (4th ed. 1994). The scale uses a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status. A GAF score in the 31 to 40 range indicates some impairment in reality testing or communication or major impairment in several areas, such as work, school, family relations, judgment, thinking, or mood. The GAF scale was omitted from DSM–5 because of its "conceptual lack of clarity. . . and questionable psychometrics in routine practice." American Psychiatric Institute, Diagnostic and Statistical Manual of Mental Disorders ("DSM–5") 16 (5th ed. 2013).

[21]     Rec. Doc. 7-2 at 389-391.

process was spontaneous, loose, and tangential at times. He reported that he could not sleep, and that he was having auditory and visual hallucinations and paranoid delusions. He was rambling and a poor historian but gave a history of having been diagnosed with bipolar disorder years ago and having had multiple inpatient hospitalizations. He reported that he had taken Ativan and Xanax in the past, which had worked well for him, and he reported that Geodon had caused extrapyramidal symptoms. He also stated that he took his medicine when he wanted to, not as prescribed. Nurse Vaughn explained, however, that medication compliance was required for continued care. She found Mr. Suttoon to have average intelligence, poor judgment, and poor insight; in her opinion, his prognosis was guarded. She modified his medications and explained the medication plan to his wife. Her assessments were chronic paranoid schizophrenia, bipolar disorder with psychotic features, insomnia, generalized anxiety disorder, and extrapyramidal symptoms.

When Mr. Suttoon saw nurse Vaughn again on October 27, 2017,[22] he was appropriately dressed, with good hygiene. He had no unusual body movements and a steady gait. His speech was clear with good articulation at a slightly elevated rate and normal volume but rambling. His affect was pleasant, he described his mood as

---

[22]     Rec. Doc. 7-2 at 387-389.

"it changes," and his thought process was spontaneous and mildly loosened.  He denied having hallucinations.

Mr. Suttoon's rambling had decreased some when he saw nurse Vaughn on November 3, 2017.[23]  He denied having any problems with his medications.  His sleep was good with current medications.  He was appropriately dressed, with good hygiene.  He had no unusual body movements and a steady gait.  His speech was clear with good articulation at a slightly elevated rate and volume.  His affect was pleasant, and he described his mood as "better."  His thought process was spontaneous and mildly loosened, and he denied hallucinating.

When Mr. Suttoon saw nurse Vaughn on November 10, 2017,[24] he complained of shaking and sweating, and she advised him to see his primary care physician.  He denied having any problems with his medications.  He was appropriately dressed, with good hygiene.  He had no unusual body movements and a steady gait.  His speech was clear with good articulation at a mildly increased rate and volume.  His rambling had decreased significantly, his affect was pleasant, and he described his mood as "seems to be better."  Although his thought process was spontaneous and tangential, it was easily redirected.  Mr. Suttoon stated that his

---

[23]    Rec. Doc. 7-2 at 385-387.

[24]    Rec. Doc. 7-2 at 384-385.

12

paranoia had decreased substantially, and he could now open doors and windows and look outside. He denied having hallucinations.

Mr. Suttoon saw nurse Vaughn again on November 16, 2017.[25] He was doing better and received his first Invega Sustenna injection. He denied any problems with medication. He was appropriately dressed, with good hygiene. He had no unusual body movements and a steady gait. His speech was clear with good articulation at a mildly increased rate and volume but rambling. His affect was pleasant, his mood was described as "pretty good," his thought process was spontaneous and tangential but easily redirected. He denied having hallucinations but exhibited some paranoia.

On December 12, 2017, nurse Lastrapes had difficulty getting a history from Mr. Suttoon because "he rambles on and on."[26] His chief complaint was sweaty palms and tremors, which he related to his anxiety and claimed to have had for years when he was nervous. No medication was prescribed for this condition.

Mr. Suttoon saw nurse Vaughn on December 21, 2017.[27] He had run out of medication a week earlier and was manic. He agreed to have a health care provider speak with his wife. He denied having any problems with his medication. He reported that his sleep was good. He was appropriately dressed, with good hygiene.

---

[25]     Rec. Doc. 7-2 at 382-384.

[26]     Rec. Doc. 7-2 at 420.

[27]     Rec. Doc. 7-2 at 380-382.

He had no unusual body movements and a steady gait.  His speech was clear with good articulation at a normal volume but pressured.  His affect was pleasant, his mood was described as "doing," his thought process was spontaneous, loose, tangential, and difficult to redirect.  He denied having hallucinations but stated that people were out to get him.  His medications were adjusted.

Mr. Suttoon saw nurse Vaughn again on January 26, 2018.[28]  He denied having any problems with his medications and stated that he felt better after getting an Invega Sustenna shot although the effect wore off a couple of days before the next shot.  He claimed to get muscle spasms when he failed to take Benztropine as prescribed.  He stated that he was not taking Buspar because he was afraid it would make him sick.  He had felt depressed when his wife left for a few days but started feeling better when she returned.  He was appropriately dressed, with good hygiene.  He had no unusual body movements and a steady gait.  His speech was clear with good articulation at a normal rate and volume but rambling.  His affect was pleasant, his mood was described as "depression mode," his thought process was spontaneous and tangential, and he indicated that his paranoia comes and goes.  On April 3, 2018,[29] Mr. Suttoon saw nurse Vaughn again.  His depression was evaluated, and his medication list was reconciled.

---

[28]     Rec. Doc. 7-2 at 379-380.

[29]     Rec. Doc. 7-2 at 419-420.

14

On May 7, 2018, Mr. Suttoon transferred his medication management from nurse Vaughn to psychiatrist Dr. Ashley Doucette at Southwest.[30]  His appearance, grooming, behavior, and affect were normal.  His attitude was cooperative.  His mood was dysthymic and anxious.  His thought processes and thought content were not impaired.  He denied having hallucinations, but reported increased anxiety, worry, and restlessness.  Dr. Doucette noted that Mr. Suttoon otherwise reported good efficacy with his medications and reported no additional side effects or complications related to his treatment.  Dr. Doucette described his condition as stable.  Her assessments were paranoid schizophrenia, generalized anxiety disorder, taking long-term medication, bipolar I disorder, most recent episode, depressed – severe with psychotic features, and schizoaffective disorder.  She also noted that he had bipolar depression with psychotic features, generalized anxiety disorder, insomnia, and a history of extrapyramidal symptoms.  Her plan was to add Ativan and Lexapro to the medication regimen.  It was noted that he had organic insomnia due to his mental disorders.

Mr. Suttoon returned to nurse Lastrapes on November 26, 2018 with concerns about his blood pressure and was prescribed medications.[31]  On December 27, 2018,

---

[30]    Rec. Doc. 7-2 at 418-419.

[31]    Rec. Doc. 7-2 at 416-418.

he saw nurse Lastrapes for low back pain.[32]  On January 10, 2019, Mr. Suttoon was diagnosed with Bell's palsy.[33]  On February 6, 2019, his medications were refilled.[34]

On April 3, 2019, Mr. Suttoon testified at a hearing regarding his application for disability benefits.  He stated that he lives with his wife and three children. Neither he nor his wife worked, and they depended on family members for financial assistance.  He stated that he stopped driving about two years earlier.  He completed the sixth grade but is very slow doing math.  He testified that as a child in school he had a problem with being able to focus and concentrate, which worsened over time.

Mr. Suttoon testified that he was first diagnosed with a bipolar condition and schizophrenia in 2017.  Since that time, he had seen a mental health professional every month but had recently been rescheduled to every three months, although he continued to take a monthly injection to treat his schizophrenia.  He admitted to medication noncompliance in the past but testified that he was now taking his medication as prescribed.  He stated that the medications help his condition but do not completely relieve his symptoms.

He also testified that his medications cause side effects.  He stated that he has blurry vision, which makes it difficult for him to read and is a side effect of

---

[32]    Rec. Doc. 7-2 at 415-416.

[33]    Rec. Doc. 7-2 at 413-414.

[34]    Rec. Doc. 7-2 at 413.

Benztropine.  Additionally, he claimed that his medications made him drowsy and caused him to sleep a lot.  He claimed that his doctors had adjusted his medications in order to reduce his drowsiness without success.

Mr. Suttoon denied doing any childcare, cooking, or other household tasks. He denied using a cell phone or computer.  He stated that he could take care of his own personal hygiene, except that his wife washed his hair and shaved him.  He claimed to have trouble remembering to take his medicine.  He said that he rarely went outside his home, had no hobbies, and sometimes watched TV but was not always able to watch a program all the way through.  He stated that he could not sleep without sleeping pills.  He admitted that he talked too much because he is manic.  People had told him that he was aggravating, hard-headed, did not listen, and talked too much.  He admitted having racing thoughts, being nervous, and being anxious.  He stated that he talked too much listened too little but was unable to control it.  He estimated that he could focus or concentrate for only about ten or fifteen minutes.  He testified that even though he was on medication he still had paranoid delusions.  He stated that he had sweaty and shaking hands when he was nervous.  He said he was given medicine for that, which helped.  He also stated that he could not get along with people.  Mr. Suttoon testified that when he was in a depressed state he did not want to come out of his room or look out the windows.

Mr. Suttoon now seeks reversal of the Commissioner's adverse ruling.

17

## Analysis

**A.    Standard of Review**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[35] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[36] Substantial evidence "must do more than create a suspicion of the existence of the fact to be established, but 'no substantial evidence' will only be found when there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'"[37]

If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[38] In reviewing the Commissioner's findings, a court must carefully examine the entire record, but refrain from re-weighing the evidence or substituting its judgment for that of the Commissioner.[39] Conflicts in

---

[35]    *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

[36]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[37]    *Hames v. Heckler*, 707 F.2d at 164 (citations omitted).

[38]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[39]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

the evidence[40] and credibility assessments[41] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:  (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[42]

## B.    Entitlement to Benefits

The DIB program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence.[43]  A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[44]  A claimant is disabled only if his impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work

---

[40]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[41]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[42]    *Wren v. Sullivan*, 925 F.2d at 126.

[43]    See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

[44]    42 U.S.C. § 1382c(a)(3)(A).

experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[45]

## C.    Evaluation Process and Burden of Proof

The Commissioner uses a sequential five-step inquiry to determine whether a claimant is disabled, which considers whether the claimant (1) is currently engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment enumerated in the relevant regulations; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[46]

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[47] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[48]  The claimant's residual functional capacity is used at the fourth step to

---

[45]    42 U.S.C. § 1382c(a)(3)(B).

[46]    20 C.F.R. § 404.1520; *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).

[47]    20 C.F.R. § 404.1520(a)(4).

[48]    20 C.F.R. § 404.1545(a)(1).

determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[49]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[50]  This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[51]  If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to rebut this finding.[52]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[53]

## D.    **The ALJ's Findings and Conclusions**

In this case, the ALJ determined, at step one, that Mr. Suttoon has not engaged in substantial gainful activity since February 15, 2017.  This finding is supported by substantial evidence in the record.

---

[49]     20 C.F.R. § 404.1520(e).

[50]     *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[51]     *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

[52]     *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[53]     20 C.F.R. § 404.1520(a)(4); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

At step two, the ALJ found that Mr. Suttoon has the following severe impairments: anxiety, depression, bipolar disorder, manic with psychotic features, and schizophrenia, paranoid type. This finding is supported by substantial evidence in the record.

At step three, the ALJ found that Mr. Suttoon has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. Mr. Suttoon did not challenge this finding.

The ALJ found that Mr. Suttoon has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: he could not do complex work and would require a work environment with only occasional interaction with the general public because he is more comfortable working with things than with people. Mr. Suttoon challenged this finding.

At step four, the ALJ found that Mr. Suttoon is not capable of performing any of his past relevant work. Mr. Suttoon did not challenge this finding.

At step five, the ALJ found that Mr. Suttoon was not disabled from February 15, 2017 (the alleged disability onset date) through May 22, 2019 (the date of the decision) because there are jobs in the national economy that he can perform. Mr. Suttoon challenged this finding.

E.     **The Allegations of Error**

Mr. Suttoon contends that the ALJ erred (1) by failing to give specific reasons why he found the claimant not credible; (2) by failing to consider the side effects of the claimant's medication; and (3) by failing to consider important information.

F.     **The Claimant's Credibility**

Mr. Suttoon argued that the ALJ erred in failing to provide specific reasons why he found him to lack credibility. The ALJ has the responsibility to evaluate the claimant's credibility,[54] and credibility determinations are generally entitled to great deference.[55] To determine credibility, the ALJ must review the entire record and expresses specific reasons for his credibility findings, but the ALJ does not have to discuss every piece of evidence.[56] If the ALJ explains his credibility findings and substantial evidence supports those findings, the court must affirm the ALJ's credibility assessment.[57]

In this case, the ALJ said that he found "the claimant's statements concerning the intensity, persistence[,] and limiting effects of [his] symptoms are not entirely

---

[54]    *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2008).

[55]    *McKnight v. Astrue*, 340 Fed. App'x 176, 181 (5th Cir. 2009) (citing *Newton v. Apfel*, 209 F.3d 448, 459 (5th Cir. 2000)).

[56]    *Giles v. Astrue*, 433 F. App'x 241, 249 (5th Cir. 2011).

[57]    *Undheim v. Barnhart*, 214 Fed. App'x 448, 451 (5th Cir. 2007).

consistent with the medical evidence and other evidence in the record."[58]  The ALJ then compared Mr. Suttoon's claim that he is unable to work against the evidence in the record, noting that his health care providers found, at various times, that he was oriented, cooperative, had an intact memory, had average intelligence, and in May 2018 had normal thought process, thought content, affect, and behavior.  Thus, the ALJ did cite specific bases for his credibility finding.  The evidence shows that Mr. Suttoon's symptoms improved with consistent out-patient medication management. Nurse Vaughn and Dr. Doucette consistently noted that Mr. Suttoon was oriented, cooperative, and appropriately dressed.  They noted that he had good hygiene, no unusual body movements, clear speech, no evidence of suicidal or homicidal ideation, and a pleasant affect.  After he began treating with Nurse Vaughn, he stopped having auditory and visual hallucinations, his paranoia improved, and his rambling became easier to redirect.  Mr. Suttoon became manic when he ran out of medication, but his condition improved when his prescriptions were refilled.  He also became depressed when his wife left for a few days, but his condition improved when she returned.  Although Dr. Cavanaugh described Mr. Suttoon's mental health problems as severe and stated that his impairments would negatively affect his ability to tolerate the stress and pressure in the workplace and to sustain effort over

---

[58]     Rec. Doc. 7-1 at 20.

a forty-hour work week, she evaluated his condition before he began medication management with Nurse Vaughn and Dr. Doucette.  Dr. Cavanaugh did not evaluate Mr. Suttoon after his condition improved from late 2017 through 2018.  Therefore, there is substantial evidence in the record supporting the ALJ's conclusion that Mr. Suttoon's functionality was not as seriously impaired as he contended.

## G.    The Side Effects of the Claimant's Medication

Mr. Suttoon argued that the ALJ failed to address the impairment resulting from the side effects of his medications.  The ALJ is required to consider the side effects of medication when evaluating a claimant's symptoms and also when evaluating a claimant's residual functional capacity.[59]  When evidence concerning the side effects of medication is ignored by the ALJ, the ALJ's findings are not substantially supported by the record when viewed as a whole.[60]

In this case, Mr. Suttoon complained at the hearing about his medication causing drowsiness and blurry vision.  However, at five appointments with the nurse practitioner who managed his medication, he denied having any problems with his medication.  When Nurse Vaughn noticed his shaking and sweating hands, he followed her instructions and discussed this condition with his primary care provider.  But he did not correlate the shaking and sweating to his medication;

---

[59]    *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999).

[60]    *Loza v. Apfel*, 219 F.3d at 397.

instead, he correlated it to his underlying mental health conditions. Similarly, there is no correlation in the medical records between Mr. Suttoon's alleged blurry vision and the medications he was taking nor is there any indication that he discussed this condition with Nurse Vaughn or Dr. Doucette after his initial visit at Southwest. Further, the record indicates that he sought treatment from an ophthalmologist. Thus, the record contains no corroboration of Mr. Suttoon's complaints about medication side effects. Accordingly, to the extent that the ALJ failed to expressly address the alleged side effects of Mr. Sutton's medications, the ALJ did not err.

## H.   **Other Important Information**

Mr. Suttoon complained that the ALJ failed to consider critical information relevant to his impairments. Specifically, he cited the ALJ's reference to his watching television and shopping for groceries and argued that the ALJ failed to develop contextual information concerning the frequency of those activities, the amount of assistance required when shopping, or other relevant considerations. But Mr. Suttoon was represented by – and questioned by – his counsel at the hearing. Therefore, testimony could have been elicited at that time to paint a more detailed picture of his activities and limitations and prove the extent of his claimed disability. Mr. Suttoon also stated in his briefing that the ALJ overlooked the fact that he had been hospitalized three to four times for paranoia and schizophrenia. However, there are no records from any hospital, institution, or treating source substantiating that

26

contention. The record documents only a single in-patient hospitalization for psychiatric problems. Similarly, Mr. Suttoon claimed that he "has recently, once again been institutionalized for violent unprovoked behavior."[61] But no evidence supporting that contention was found in the record either. Accordingly, this Court finds that the claimant failed to establish the existence of material information that was neglected by the ALJ in formulating his ruling.

## Conclusion and Recommendation

For the foregoing reasons,

IT IS THE RECOMMENDATION of this Court that the decision of the Commissioner should be AFFIRMED and this matter should be dismissed with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

---

[61]   Rec. Doc. 10 at 5.

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[62]

Signed in Lafayette, Louisiana, this 13th day of May 2021.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[62]     See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).